## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                             Crim. No. 17-777 KG

HUMBERTO CERECER-FRAIRE,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before me upon Defendant Humberto Cerecer-Fraire's "Motion to Suppress Physical Evidence and Statements" ("Motion"). ECF No. 28. In accordance with 28 U.S.C. §§ 636(b)(1)(B) and (b)(3), the presiding judge referred this Motion to me to conduct hearings and recommend an ultimate disposition. *See* Order of Reference, ECF No. 30. Having reviewed the record, the parties' briefing, relevant case law, and the testimony and exhibits presented at the May 10, 2017 evidentiary hearing, I recommend for the following reasons that the Motion be denied.

### PROCEDURAL BACKGROUND

In this Motion, Defendant challenges the Border Patrol's roving patrol stop of a vehicle in which he was a passenger on the night of December 20, 2016. Defendant also contests the lawfulness of his subsequent roadside investigative detention. Defendant urges the Court to suppress all evidence generated from the stop and the roadside detention, headlined by the more than five kilograms of methamphetamine recovered from the trunk of the vehicle.[1]

---

[1] Defendant does not challenge in this motion the admissibility of statements he later made after being arrested and transported to the Border Patrol Station. *See* Clerk's Mins. 1, ECF No. 37 (pre-hearing status conference). Defense

Defendant specifically asserts that the agent did not have reasonable suspicion to make the stop at all, notwithstanding the fact that the vehicle had made a U-turn to apparently avoid a Border Patrol checkpoint. *See* Def.'s Mot. 4. Defendant further argues that the investigative detention of him that followed the stop exceeded both in scope and in time what reasonableness permitted. *See id.* at 5-6.

For its part, the United States responds that a substantial combination of facts and circumstances gave the agent well more than reasonable suspicion to stop the vehicle to investigate whether alien smuggling was occurring. *See* Gov't.'s Resp. 10-12, ECF No. 29. The United States further emphasizes that the duration and scope of the resulting investigative detention were reasonable, particularly given additional suspicious information obtained by the agents after the stop and the brief lapse of time between the stop and the driver's admission that there was methamphetamine in the vehicle. *See id.* 12-14.

On May 10, 2017, I held an evidentiary hearing. The United States called four witnesses (Border Patrol Agents Benjamin Perry, Jose Granados, Israel Diaz, and Durango Ayala) and introduced 18 exhibits. *See* Clerk's Mins. 11-12, ECF No. 50. Defendant called private investigator Jim Laws to testify and introduced one additional exhibit. *See id.*

**FACTUAL FINDINGS**

I make the following factual findings based on the testimony of the five witnesses who testified and the exhibits that were introduced. Because no finalized transcript has been prepared, I do not cite to one. Unless more specifically explained herein, I have resolved any disputes in the testimony consistent with the following findings.

---

counsel reaffirmed at the outset of the evidentiary hearing that Defendant's statements were not at issue in this motion. *See id.*

1.   On December 20, 2016, United States Border Patrol Agent Benjamin Perry was on duty in his official capacity working the 7:00 p.m. – 5:00 a.m. shift.  He has been a Border Patrol agent for more than seven years and has been assigned to the Las Cruces station the entire time.  Agent Perry was assigned that evening to perform duties associated with the Border Patrol's permanent checkpoint located near mile marker 26 on New Mexico Highway 185 which runs from Las Cruces to Hatch.  Highway 185 is west of and runs roughly parallel to the Rio Grande and Interstate 25.

2.   Highway 185 services a largely rural and agricultural area.  Although there are numerous residences that are accessed via that highway, the area is nonetheless thinly populated.  Between the communities of Radium Springs and Hatch, there are no commercial businesses on that highway.  By comparison to I-25, the traffic on Highway 185, especially at night, is very light.  Agent Perry testified that "maybe a couple of cars" will go through the Highway 185 checkpoint at night.

3.   On the night of December 20, 2016, Agent Perry was functioning as a member of the "Tactical Enforcement Team."  He explained that the purpose of the team is to conduct surveillance of the few miles of Highway 185 that are south of the checkpoint, as well as the foot trails, washes, and arroyos in that area that splinter off from the highway.  The team member is usually posted atop either of two small mountains, which are referred to as the "Bluff" and the "Skybox."  The team member's assignment is to use binoculars and other technology to look for indications of alien smuggling.

4.   According to Agent Perry, the Border Patrol implemented this team some years ago to counteract and defeat a *modus operandi* by alien smugglers of circumventing the checkpoint.  He explained that the *modus operandi* involves a smuggler dropping off the aliens at a location

south of the checkpoint, the aliens then walking around the checkpoint on foot using a network of washes or the dry riverbed, and then another smuggler picking the aliens up at a location north of the checkpoint. Over time, the Border Patrol has become familiar with the locations at which aliens are most frequently dropped off and picked up and the routes they follow to get from one to the other. Agent Perry explained that two of the most frequent drop-off locations south of the checkpoint are the "23 wash" near mile marker 23 and a separate location near the "Peaceful Valley" road sign. He described the latter location as about as close as a vehicle can get to the checkpoint without being seen by agents at the checkpoint.

5.  On the night of December 20, 2016, Agent Perry was posted at the "Bluff." From there, he could see Highway 185 in the valley beneath him and could follow it visually to at least a point a couple of hundred yards north of the checkpoint, which he estimated was approximately two or three miles from the Bluff. He also could follow the highway at least a couple of miles south from his location. From this vantage, he could also hear vehicles coming from a significant distance away.

6.  Agent Perry primarily was looking for vehicles that would pull over and stop south of the checkpoint, including those that would subsequently turn around. He has experience in prior cases in which motorists engaged in this behavior and were thereafter stopped and discovered to be involved in smuggling aliens.

7.  Agent Perry testified that the checkpoint itself is well-illuminated at night and the lights can be seen for some distance by motorists approaching from the south. He added that there is also a sign indicating the presence of a U.S. Border Patrol checkpoint roughly a half-mile or so south of the checkpoint.

8.   At approximately 10:30 p.m. on December 20, 2016, Agent Perry took note of a northbound vehicle that went by the Peaceful Valley sign.   He testified that the vehicle then stopped and its lights went out.   He estimated that, after approximately 10 seconds, the vehicle turned around and headed southbound.   Based on the behavior of the vehicle, Agent Perry believed that its driver had dropped off illegal aliens.   He first tried to radio his colleagues at the checkpoint to advise them of the "turn-around," but was unable to reach them.   So he used his cellphone to notify them instead.

9.   Although he could not recall precisely which agent he notified, Agent Perry believed that he was speaking to Agent Israel Diaz.   Agent Perry recalled that he told his fellow agent that a vehicle had "blacked out" (turned off its lights) and then turned around and drove south.   Agent Perry understood that the agents at the checkpoint were going to look for footprints at the suspected drop-off location and also intercept the vehicle that had turned around.

10.   Agent Perry eventually was able to use his radio to communicate with fellow agents and kept them apprised of the vehicle's location as it headed south.   Because the checkpoint was nearing a shift change, Agent Jose Granados was headed northbound to the checkpoint from Las Cruces.   Agent Perry was able to relay via radio to Agent Granados the location of the suspect vehicle.

11.   Agent Perry observed no other vehicle traffic on Highway 185 at this time on that night except for the suspect vehicle and the pursuing agents' vehicles.   Although Agent Perry could not see from the Bluff the location where the suspect vehicle was apprehended, he believed that only a few seconds had passed between the time it left his vision and when he heard the radio traffic that it had been intercepted by Agent Granados.

12. Agent Perry's night vision equipment was inoperative that night, so he was unable to see whether any persons had in fact been dropped off at the turnaround location.

13. Agent Perry was not the case agent on this case, nor did he prepare a supplemental report. He admitted that he had reviewed the case agent's report at some point before his testimony. He further admitted that the report was silent on the suspect vehicle having turned off its lights before turning around south of the checkpoint. He also admitted that the report did not include any reference to him having kept his colleagues apprised of the location of the suspect vehicle as it made its way southbound.

14. I find that Agent Perry testified in a credible fashion. I listened to him carefully as he answered questions from counsel. I questioned him myself on his confidence in the accuracy of his memory of the events of this night, particularly considering the passage of time and his failure to prepare a supplemental report memorializing his observations. Based on the detail and content of his responses, and his demeanor while giving them, I conclude that his testimony was credible.

15. Jose Granados has served as a U.S. Border Patrol Agent for approximately ten years, all while assigned to the Las Cruces station. He is very familiar with Highway 185 and its checkpoint. He testified that the checkpoint is within 100 air miles of the international border. He also testified that Highway 185 normally features only local commuters, ranchers, and residents, and that it is very unusual to see a vehicle on that roadway with out-of-state tags.

16. Agent Granados echoed the alien smugglers' *modus operandi* that had been described by Agent Perry. Agent Granados explained that the agents receive actual training on the smugglers' patterns and how to defend against them. He advised that, in 2016, there had been 44 illegal aliens apprehended while trying to circumvent the Highway 185 checkpoint.

17.   On the night of December 20, 2016, Agent Granados was on duty in his official capacity and headed northbound on Highway 185 to relieve other agents at the checkpoint.  He overheard radio traffic at approximately 10:30 p.m. to the effect that there had been a suspicious vehicle turn around south of the checkpoint.  Agent Granados was somewhere between mile markers 16 and 17 when he heard this radio traffic.

18.   Agent Granados pulled his marked unit over to await the suspect vehicle.  He continued to overhear Agent Perry calling out the vehicle's whereabouts via radio.  There were no other vehicles traveling in either direction on Highway 185 at that time.

19.   A dark-colored sedan approached and then passed Agent Granados' location.  This vehicle is depicted in Government's Exhibits 11-13.  It bore Nevada plate 39F-244 on both its front and rear bumpers.  Agent Granados pulled in behind the sedan as it headed southbound.  He called in records checks on the vehicle to inquire into the registered owner and whether the vehicle was stolen.  The vehicle was not reported as stolen.

20.   Agent Granados also inquired into whether the vehicle had gone through any international port-of-entry or any other Border Patrol checkpoint within the preceding 72 hours. The records check revealed that the vehicle had gone westbound through the Border Patrol checkpoint on Interstate 10 west of Las Cruces the preceding day.  Given his experience, Agent Granados thought this to be highly unusual, particularly given the out-of-state plates.  He immediately suspected that the vehicle was engaged in alien smuggling because the communities of Deming and Columbus, New Mexico, and Palomas, Chihuahua, are located west of the I-10 checkpoint and are known by the Border Patrol to be locations where undocumented aliens are picked up for transportation into the interior of the United States.

21.   Agent Granados knew from his experience that alien smugglers often seek to sequence their activities at night and at or near the time that checkpoints are undergoing shift changes.

22.   Because of the time of night, the proximity to shift change, the rarity of out-of-state plates on this highway, the 72-hour lane check results, the vehicle having turned around at a location consistent with the *modus operandi* that smugglers are known to employ to circumvent the checkpoint, Agent Granados decided to engage his vehicle's emergency equipment and stop the sedan.  Agent Granados admitted that the vehicle had not engaged in any evasive maneuvers once he began trailing it.

23.   Agent Granados approached the passenger side, while Agent Diaz approached the driver's side.  The vehicle featured an adult female driver, an adult male in the front passenger seat, and two small children in the back.

24.   Agent Granados asked the adult passenger, who he later identified as Defendant Cerecer-Fraire, for his immigration documents.  The passenger responded by instead producing his State of Arizona identification card, issued June 7, 2016, with a Tucson address.  When Agent Granados renewed his request for immigration documents, the passenger pulled out an employment authorization card.

25.   Agent Granados was suspicious of the combination of the Nevada license plate and the Arizona identification card.  In his experience, those two things did not fit together and he continued to suspect that alien smuggling might be taking place.

26.   The employment authorization card alerted Agent Granados to the fact that the passenger was a citizen of Mexico and not a United States citizen.  The category of A20

emblazoned on the card suggested to the agent that the passenger may have been a beneficiary of "deferred action" or a family member of a government informant of some kind.

27.   Agent Granados asked the passenger whether he and the driver were married or boyfriend and girlfriend.   The passenger responded that they were just friends.   The agent thought that answer was suspicious in light of the time of night at which all of this activity was occurring.

28.   Agent Granados observed that the passenger was rubbing his own legs nervously.   In his experience, the agent believed that behavior to be out of place and added to the agent's suspicion of criminal activity.

29.   Agent Granados could overhear some of Agent Diaz's conversation with the driver. Agent Granados heard the driver say that "they were lost" and trying to look for I-25.   He also heard her explain that they were heading to Flagstaff, Arizona.   Agent Granados thought that answer to be peculiar because the vehicle had Nevada tags and just the day before was headed toward Arizona as it made its way through the I-10 checkpoint.

30.   Agent Granados testified that criminal history checks on the driver and the adult passenger revealed that the driver had a previous narcotics arrest out of Nogales, Arizona.   The passenger's record was clear.   Once he learned of the narcotics arrest, Agent Granados shifted his suspicion to the possibility that drug smuggling was occurring.

31.   Agent Granados testified that Agent Diaz asked the driver whether there was "anything" in the car, at which time the driver asked to speak to the agent.   The driver exited the vehicle, walked to the rear, and told Agent Diaz that there was "meth" in the trunk.

32.  No more than five minutes had elapsed from the time the stop was initiated to the driver's admission that there was "meth" in the vehicle.  Agent Granados testified that this stop was much shorter than the average roving patrol stop in his experience.

33.  A Border Patrol agent and his drug-detecting canine arrived on scene in about 15 minutes.  This agent obtained consent from the driver to deploy the canine on the vehicle.  The canine alerted to the trunk.  Agents searched the trunk and located narcotics inside suitcases in the trunk.

34.  Based on his demeanor, attention to detail, and the content of his answers, I found Agent Granados to be a credible witness.

35.  Israel Diaz has served as a Border Patrol agent for 21 years, the last nearly 10 of which have been in the Las Cruces area.  He corroborated his fellow agents' description of the *modus operandi* used by alien smugglers to defeat the Highway 185 checkpoint.

36.  On December 20, 2016, Agent Diaz was working at the checkpoint on the 2:00 p.m. – midnight shift.  He overheard radio traffic that the Tactical Enforcement Team had observed a vehicle turning around south of the checkpoint.  Agent Diaz and a fellow agent got into a marked vehicle and headed south to intercept the suspect vehicle, the location of which was still being relayed via radio.  Agent Diaz observed no other vehicles on the highway as he pursued the suspect vehicle.

37.  Agent Diaz pulled in behind Agent Granados' vehicle as Agent Granados was tailing the suspect vehicle.  Agent Diaz explained that, for safety reasons, the Border Patrol normally does not stop vehicles unless a backup vehicle is on scene.  Once Agent Diaz and the other agent arrived, they informed Agent Granados that they were behind him so that he could perform the

stop. This was after Agent Granados had received responses to the record checks that he had requested.

38. Agent Diaz attributed similar suspicion as did Agent Granados to the knowledge that the vehicle they were about to stop had the day before been recorded going through the I-10 checkpoint west of Las Cruces. He also concurred that a Nevada license plate is very unusual for Highway 185.

39. After the suspect vehicle was pulled over, Agent Diaz approached the driver's side and asked her where she was going. The driver responded by saying that she was lost and headed to Flagstaff, Arizona. Agent Diaz thought that answer was unusual because, in his experience, other drivers on Highway 185 who have been lost have proceeded to the checkpoint to get directions, rather than turning around. He further was suspicious about the Flagstaff destination because he believed the proper route would have been via I-10.

40. The driver informed Agent Diaz that she lived in Flagstaff, which he noted was inconsistent with the Nevada tags on the vehicle.

41. Consistent with standard practice, Agent Diaz asked the driver for identification. The driver produced a Nevada driver's license showing a Las Vegas address, with the license having been issued in March 2016. The agent noted the discrepancy with her claimed Flagstaff, Arizona, address and continued to suspect that alien smuggling or other criminal activity might be occurring.

42. During her interaction with Agent Diaz, the driver did not make eye contact with him and appeared nervous.

43. The agent ran criminal history checks on the driver through dispatch. He learned that she was a U.S. citizen and had a previous arrest for narcotics smuggling at the Nogales, Arizona,

port of entry a couple of years earlier. This information heightened the agent's suspicion of illegal activity.

44. The agent returned to the driver's side and advised her that he had learned of her previous narcotics arrest. He asked her whether there were any narcotics in the vehicle. After a lengthy pause, the driver asked to talk to Agent Diaz.

45. The driver emerged from the vehicle, took a couple of steps away from the car, and told the agent that she thought there was "meth" in the trunk of the vehicle. She added that it was not hers.

46. Agent Diaz and his fellow agents on scene decided to call for a canine handler. Agent Diaz remembered that it was less than ten minutes before one arrived.

47. After the canine alerted, the agents searched the trunk of the suspect vehicle and located illegal drugs inside suitcases.

48. Because there had only been three agents assigned to the Highway 185 checkpoint that night, no agent was available to investigate the location where the suspect vehicle turned around to determine whether illegal aliens had in fact been dropped off as the agents suspected.

49. Based on his demeanor, attention to detail, and the content of his answers, I found Agent Granados to be a credible witness.

50. Durango Ayala has served as a Border Patrol agent for almost five years. He has been assigned to the Las Cruces station the entire time.

51. Agent Ayala is a trained canine handler. His canine partner is trained to detect controlled substances and concealed humans.

52. Agent Ayala and his canine were on duty on December 20, 2016. He became aware via radio traffic that agents were investigating a vehicle that had turned around near the

checkpoint. From his own experience, Agent Ayala recognized the significance of such a turnaround particularly given the time of night and the proximity to the next shift change at the checkpoint. Agent Ayala began to head toward Highway 185 in case his or his canine's services were needed.

53. En route, Agent Ayala heard over the radio that the driver had a previous narcotics arrest out of Nogales. That information caused him to suspect that the vehicle's occupants might be involved in criminal activity besides alien smuggling.

54. Upon arriving on scene, Agent Ayala learned from Agent Granados that the driver had admitted that there was "meth" in the trunk and had granted consent to search the vehicle. Agent Ayala obtained another oral consent from the driver and then deployed his canine. The canine alerted to the rear of the vehicle and then to the suitcases that were subsequently removed from the trunk. Agent Ayala later field-tested the bundles and they tested positive for methamphetamine.

55. Based on his demeanor, attention to detail, and the content of his answers, I found Agent Ayala to be a credible witness.

56. Jim Laws has been a private investigator in the Las Cruces area for 23 years. He testified that county assessor records indicate that there are 18 residences on Highway 185 between where the suspect vehicle allegedly made its u-turn and where the suspect vehicle was stopped by the agents. He described this area on Highway 185 to be rural, not desolate, and that Highway 185 does have traffic on it. He described the location of a hardware store in Las Cruces and a bar in Radium Springs. He has not often used Highway 185 himself, but he might see six other vehicles on it when he does. He has also driven that route at night but does not recall how far away the checkpoint becomes visible.

57. Based on his demeanor, attention to detail, and the content of his answers, I found Mr. Laws to be a credible witness.

## LEGAL STANDARD FOR ROVING PATROL STOPS

The Fourth Amendment to the Constitution protects against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). An agent may not stop a vehicle on an "unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The necessary level of suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence," but the Fourth Amendment requires "some minimal level of objective justification" for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Consistent with these protections, "[b]order patrol agents 'on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity." *See United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)). "In determining whether a roving border patrol agent had reasonable suspicion to stop a vehicle, [courts] look at the totality of the circumstances, or in other words, 'the whole picture.'" *Cantu*, 87 F.3d at 1121 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In evaluating the constitutionality of a roving patrol stop, a court must consider the totality of the circumstances "from the perspective of the reasonable *officer*, not the reasonable *person*." *United States v. Quintana-Garcia*, 343 F.3d

14

1266, 1270 (10th Cir. 2003) (emphasis in original). "Officers must be permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

When determining whether a roving patrol stop in a border area is supported by reasonable suspicion, a court may consider any number of factors, including:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)). Furthermore, "[w]hen evaluating an officer's decision to stop a vehicle, a court may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation." *United States v. Cheromiah*, 455 F.3d 1216, 1220 (10th Cir. 2006) (quoting *Arvizu*, 534 U.S. at 267). Factors that, by themselves, may be "consistent with innocent travel" may collectively amount to reasonable suspicion. *Arvizu*, 534 U.S. at 274-75; *see also Quintana-Garcia*, 343 F.3d at 1270-71. "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885.

In situations where law enforcement officers are working together on an investigation, a court should evaluate whether their collective knowledge satisfied the appropriate legal standard, whether it be reasonable suspicion or probable cause. *See United States v. Chavez*, 534 F.3d 1338, 1345-48 (10th Cir. 2008) (citing *United States v. Zamudio-Carrillo*, 499 F.3d 1206 (10th

Cir. 2007)); *see also United States v. Wilkinson*, 633 F.3d 938, 941-43 (10th Cir. 2011).  Under the "collective knowledge" doctrine, sometimes referred to as the "fellow officer rule" or "police team concept," an officer who stops a vehicle need not himself be in possession of every fact necessary to a finding of reasonable suspicion or probable cause so long as *some* officer in that particular police team has possession of the necessary facts.  *See Chavez*, 534 F.3d at 1345-48.

Even if a vehicle stop is justified at its inception, the Fourth Amendment commands that its duration and scope must also be reasonable.  *See Kentucky v. King*, 563 U.S. 453, 461 (2011). The reasonableness of the duration and scope of a vehicle stop are determined by the particular purpose for which the vehicle was stopped.  *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).  Authority for the seizure ends when tasks tied to the underlying basis for the stop are or reasonably should have been completed.  *Id.*  In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  In *Illinois v. Caballes*, 543 U.S. 405 (2007) and *Arizona v. Johnson*, 555 U.S. 323 (2009), the Supreme Court announced that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention.  *Johnson*, 555 U.S. at 327-328 (questioning); *Caballes*, 543 U.S. at 406, 408 (dog sniff).  The Supreme Court has cautioned, however, that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission."  *Caballes*, 543 U.S. at 407.  The Supreme Court has further admonished that a seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333.

Although the scope of an investigative detention ordinarily must remain aligned with the reasons for which it was initially justified, "[o]ccupants of a vehicle may be detained further if,

during the course of a roving patrol stop, the Border Patrol agent develops an objectively reasonable and articulable suspicion that the occupants are engaged in some other illegal activity, or if the encounter becomes consensual." *Cheromiah*, 455 F.3d at 1222 (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)). The Tenth Circuit has held that "[a]n investigative seizure can continue, even after the initial suspicion has dissipated, if 'the additional detention is supported by [new] reasonable suspicion of criminal activity. In other words, reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.'" *United States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir. 2013) (quoting *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998)).

The Government bears the burden to prove by a preponderance of the evidence that the vehicle stop and subsequent investigative detention were justified. *See, e.g., United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) (citing *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011)).

**CONCLUSIONS OF LAW**

1. Viewed through the informed experience of Border Patrol agents and assessed against the non-inclusive list of factors in *Brignoni-Ponce*, the collective facts that I have found that were known to Agents Perry and Granados at the time of the vehicle stop satisfied reasonable suspicion that alien smuggling was afoot.

2. These facts include at least the following: (a) the time of night; (b) the presence of a fixed, well-marked, and well-illuminated Border Patrol checkpoint on Highway 185 that is within 100 miles of the international border; (c) the proximity of these events near a checkpoint shift change; (d) the very unusual nature of an out-of-state license plate on very-thinly traveled New Mexico Highway 185; (e) the brief stop, darkening of headlights, and the subsequent U-turn

17

executed by the suspect vehicle in close proximity to the checkpoint and at a location consistent with alien smugglers' well-known *modus operandi* for circumventing the fixed checkpoint on that roadway; (f) the presence of no other civilian vehicle traffic on Highway 185 at or near the time in question, thereby eliminating any reasonable possibility that the suspect vehicle was not the one that turned around; (g) the positive lane-crossing data showing that the same vehicle had gone westbound through the Border Patrol checkpoint on I-10 west of Las Cruces the previous day; (h) the presence of the vehicle back in Las Cruces (and now heading north out of Las Cruces) the next day, thereby raising the agents' suspicion that the vehicle may contain undocumented aliens that had been picked up west of the I-10 checkpoint and now were being moved north; (i) the apprehension of some 44 aliens in 2016 who were caught trying to circumvent the Highway 185 checkpoint; and (j) the decision of the Las Cruces station of the Border Patrol to deploy for years a "Tactical Enforcement Team" for the express purpose of defeating the *modus operandi* that alien smugglers had used to circumvent the checkpoint.

3.   Under the "fellow officer rule" or "collective knowledge doctrine," Agent Perry's knowledge that the suspect vehicle had stopped for approximately 10 seconds and darkened its headlights before then turning around and heading back south is imputed to Agent Granados, irrespective of whether Agent Perry communicated all of his observations to the other agents.

4.   At the time that Agent Granados made the traffic stop, none of the agents knew whether the vehicle had in fact dropped off aliens at the turn-around location.  Consequently, there was no evidence by that time that in any way allayed the agents' suspicion that the suspect vehicle was involved in an active alien smuggling scheme.

5.   The length and scope of the investigative detention were reasonable.  In addition to the facts known to the agent team prior to the traffic stop, Agent Granados and Agent Diaz also

developed additional information during their initial encounters with the driver and the Defendant-passenger that heightened their suspicion. This information included: (a) the driver claiming that she was "lost" on a state highway and choosing to turn around instead of proceeding a short distance ahead to ask for directions at the checkpoint; (b) the conflict between the driver's Las Vegas, Nevada, address on her driver's license and her claim of living in Flagstaff, Arizona; (c) the conflict between the Tucson, Arizona, address on Defendant's Arizona identification card and the driver stating that she and the occupants were instead headed to Flagstaff; (d) the decision to drive to Flagstaff via Highway 185, particularly considering that the vehicle had been headed a much more direct route to Arizona the previous day when it went westbound through the I-10 checkpoint west of Las Cruces; (e) the driver and Defendant's explanation that they were "just friends" despite the time of night and the presence of two small children in the back seat; and (f) unusual leg-rubbing behavior by Defendant and eye-contact avoidance by the driver that the agents in their professional opinion thought were unusual.

6. The agents were lawfully entitled to call in records checks on Defendant and the driver using their Arizona-issued documents.

7. During the course of the records returns, agents learned that the driver had a 2011 narcotics arrest at the Nogales, Arizona port of entry. In conjunction with the rest of the facts they had amassed by the time this information was conveyed to them, the agents now had reasonable suspicion to expand the scope of their investigative detention to determine whether the adult occupants of the vehicle were engaged in narcotics trafficking, instead of alien smuggling.

8. Agent Diaz's statement to the driver to the effect that he was aware of her previous narcotics arrest, and his subsequent question of her to the effect of whether there were narcotics

in the car, were within the scope of the broadened investigation.

9.  The driver's admission that she thought there was "meth" in the trunk but that it was not hers provided reasonable suspicion (perhaps even probable cause) to detain the vehicle to perform a canine sniff.

10.  The driver's admission also provided reasonable suspicion to detain her and her adult passenger for the time necessary to confirm or dispel the agents' suspicion that the two were engaged in narcotics trafficking.

11.  The length of the investigative detention, which lasted approximately only five minutes before the driver made her "meth" admission, was reasonable as a matter of law.  *See United States v. White*, 584 F.3d 935, 953 (10th Cir. 2009) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of either dispelling or confirming the officer's reasonable suspicion") (internal quotation and citation omitted).

12.  The driver's subsequent consent to the canine search was voluntary.

13.  Defendant does not have standing to complain about the voluntariness of the driver's consent.

14.  Defendant has not established standing to complain about the search of the vehicle at all, but only his own personal detention.  *See United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009)  ("Because Fourth Amendment rights are personal, a defendant may only claim the benefits of the exclusionary rule if [his] own Fourth Amendment rights have in fact been violated.") (internal citation omitted); *see also United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) ("[W]ithout a possessory or property interest in the vehicle searched, passengers lack standing to challenge vehicle searches.") (internal citation omitted).

15.  The positive alert by the canine provided the agents with probable cause to search the

vehicle for narcotics.

16.  The discovery of the methamphetamine provided the agents with probable cause to arrest both the driver and Defendant.

17.  The facts I have found are substantially stronger than the facts presented in *United States v. Castro*, 929 F.Supp.2d 1140 (D.N.M. 2013), a case on which Defendant derives his principal support.  Even though that decision is not binding on any other district judge, the factual distinctions between that case and the instant one are so vast as to make *Castro* easy to distinguish.  To begin, in *Castro*, a Border Patrol agent stopped a vehicle that had turned around about a mile short of a *temporary* checkpoint on a New Mexico state highway.  The agent did so *solely* on the mistaken belief that turning around instead of proceeding through a checkpoint was a violation of federal law.  *Id.* at 1143-44.  *Castro* featured essentially none of the other suspicious facts that are present before me.  *See, supra,* ¶ 2, pages 17-18.  The case before me is *much* more than the mere turn-around case that was before Judge Brack in *Castro*.

For the foregoing reasons, I recommend that Defendant's Motion be **DENIED.**

**IT IS SO RECOMMENDED**.


_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**